UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

WILLIAM A. ORANGE,        )
                          )
      Plaintiff,          )
                          )     No. 4:09-CV-72
v.                        )
                          )     *Mattice / Lee*
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,  )
                          )
      Defendant.       )

## REPORT AND RECOMMENDATION

This action was brought by Plaintiff William A. Orange ("Plaintiff") pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social

Security ("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB")

supplemental security income ("SSI"). Plaintiff seeks the award of benefits, or in the alternative,

a remand to the Commissioner. Plaintiff has moved for judgment on the pleadings [Doc. 8], and

Defendant has moved for summary judgment [Doc. 13]. For the reasons stated below, I

**RECOMMEND**: (1) Plaintiff's motion for judgment on the pleadings [Doc. 8] be **GRANTED**;

(2) Defendant's motion for summary judgment [Doc. 13] be **DENIED**; (3) the decision of

Commissioner be **REVERSED**; and (4) this action be **REMANDED** to the Commissioner.

## I.    ADMINISTRATIVE PROCEEDINGS

On February 3, 2006, Plaintiff applied for SSI and DIB, alleging disability since June 1, 2005

(Tr. 89-99). Plaintiff alleged disability from acute, chronic pain in his knees, elbows, and back, as

well as neck problems, high blood pressure, and depression (Tr. 104). His claim was denied initially and on reconsideration (Tr. 48-54, 62-65). After a hearing held on May 30, 2008 (Tr. 20), the Administrative Law Judge ("ALJ"), by decision dated September 2, 2008, determined Plaintiff was not disabled (Tr. 20-28). On June 17, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1).

## II.    DISABILITY DETERMINATION

The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps to show the extent of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). In order to make the required findings at steps four and five, the ALJ must assess the claimant's residual functional capacity ("RFC"). Plaintiff challenges

the ALJ's assessment of his RFC, arguing the ALJ misstated the record, failed to give appropriate deference to his treating physician's opinion, improperly discredited his subjective complaints of pain, and did not properly account for the effects of his obesity.

## III.    FACTUAL BACKGROUND AND ALJ'S FINDINGS

Plaintiff weighed 300 pounds, was 5'10" tall, and was 42 years old at the time of the hearing before the ALJ (Tr. 34).  Plaintiff testified he had been a bodybuilder from the age of 14, and was at one time capable of lifting 800 pounds, but could no longer work out except to do "girly" pushups and walk twice per week (Tr. 34-39).  Neither Plaintiff nor his wife work, and Plaintiff lives with his wife and son in a trailer on his brother's property (Tr. 32).  The trailer is supplied with water by a garden hose (*id.*).  Plaintiff receives $230 per month in veterans' disability payments and food stamps (*id.*).  Plaintiff testified his wife stays home to care for him because he cannot get out of bed and dress himself without help (Tr. 33)

According to Plaintiff's application, he cannot sit, stand, or walk for greater than 15 minutes at a time, and he stays in bed mostly and reads, getting up only to make ice packs for his joints and to go to the bathroom for "hygiene" (Tr. 111-12).  Plaintiff stated he has difficulty performing self-care tasks and cannot do outside chores, but does occasionally go shopping for home repair items, and he occasionally performs light home repairs such as replacing doorknobs (Tr. 113-14).  Otherwise, Plaintiff stated he does not get out on a regular basis except to attend doctors' appointments (Tr. 115).  He goes shopping three to four times per year, but his wife handles as much of the shopping as possible (Tr. 114).  Plaintiff has used crutches for walking, but they were not prescribed by a physician (Tr. 117).  Plaintiff stated the pain from his condition has gradually worsened since 1996 and he takes hydrocodone to control it (Tr. 127).

Plainitff served in the military and had worked in the past as a construction worker, laborer, and truck driver (Tr. 105). He attended school through the 12th grade (Tr. 108).

## A. Plaintiff's Treatment History

Plaintiff reported he had a meniscus tear in his left knee in 1984 and had three surgeries on that knee between 1984 and 1988 (Tr. 216-17). He also had surgery on his left knee to repair his anterior cruciate ligament ("ACL") (Tr. 223). Plaintiff also suffered an achilles tendon tear, which was repaired surgically (Tr. 224, 226).

Plaintiff's treatment notes begin on November 16, 2005, when he visited the Veterans' Administration ("VA") facility with complaints of right foot pain and swelling, right elbow pain and swelling, and left knee pain (Tr. 173). Plaintiff reported the pain had been ongoing for six to eight months, and he could not work (*id.*). The tests revealed degenerative changes of the elbow joint, screws in the knee from a previous surgery, and possible calcific tendonitis/bursitis of the foot (Tr. 181-83). The treatment notes show Plaintiff was taking an "excessive" amount of Tylenol (Tr. 174). CT scans of Plaintiff's spine showed mild disc degeneration of the thoracic spine and mild facet degenerative changes in the lumbar spine with some sclerosis infusion of the left SI joint (Tr. 180).

In January, 2006, Plaintiff reported that his prescribed pain medication (hydrocodone) was working well enough to allow him to exercise some and that his pain was "intermittent," but he complained that his left knee was "giv[ing] out without warning" (Tr. 171-72, 235-36). In February, 2006, Plaintiff complained of tingling in his arm and back pain (Tr. 170). He reported an old elbow injury that was treated with repeated steroid injections (*id.*). MRI scans were performed of Plaintiff's lumbar spine and foot, and they showed dessication and a minimal central bulge of one of his discs and tendinopathy of the Achilles tendon from partial tears (Tr. 175-77).

In April, 2006, VA notes state that Plaintiff did not need assistive aids for walking, but could not stand for more than a few minutes at a time or walk more than a few yards (Tr. 216). Plaintiff walked with an antalgic gait and his left knee joint clicked or snapped when moving through its range of motion (Tr. 218-19). X-rays showed that Plaintiff's graft for his previous ACL surgery appeared intact, but his medial meniscus was of "[m]arkedly diminished size" (Tr. 220). VA physician Valerie Moore diagnosed Plaintiff with left knee arthritis and meniscus tear and obesity, and she described the "functional effects" of Plaintiff's knee condition as preventing him from chores, exercise, and sports (Tr. 220-21).

In April, 2006, VA physician Joyline D. James, offered to refer Plaintiff to a pain consultant for foot, knee, and back pain, but Plaintiff declined (Tr. 226-27). In May, 2006, Plaintiff was treated by VA physician Charles Huddleston for intermittent numbness in his hands (Tr. 225). Dr. Huddleston noted that Plaintiff ambulated independently with a normal gait (*id.*). An electrodiagnostic study showed evidence of neuropathy (*id.*). After discussing treatment options, Plaintiff chose a conservative course, with splints to be worn at night (Tr. 226). Dr. Huddleston stated that if symptoms did not improve within two to three months, he would recommend surgery (*id.*).

In June, 2006, Plaintiff complained of right knee pain (caused by favoring his left knee), back pain, foot pain and swelling, and bilateral carpal tunnel syndrome (Tr. 223). VA physician Norman Sims, found no swelling of the knee or foot, but noted that an MRI showed a bulging disc and dessication of "a few" discs (*id.*). Dr. Sims noted that x-rays showed early degenerative changes in both knees (Tr. 224). He recommended an MRI of the right knee, continuation of conservative treatment for carpal tunnel syndrome, and suggested a referral to the Pain Clinic or neurosurgery for

low back pain (*id.*).

In December, 2006, Plaintiff attended an appointment with Dr. Sims, who told him that the images from his MRI had been lost (Tr. 326). Plaintiff was frustrated and angry, and told Dr. Sims that the lost MRI showed he needed surgery to repair a torn meniscus (*id.*). Dr. Sims diagnosed Plaintiff with a torn right meniscus, arthrosis, Baker's cyst, effusion, and prepatellar bursitis, and opined that Plaintiff's "favoring" of his left knee, along with his obesity, had likely "permanently aggravated" the degenerative disease process in his right knee (Tr. 333-34). Dr. Sims described the "functional effects" of Plaintiff's knee problems as preventing him from performing chores, shopping, exercise, and sports, and moderately affecting his ability to recreate and travel (Tr. 333). Dr. Sims also stated Plaintiff needed a knee brace for ambulation (Tr. 330). Plaintiff was referred to an orthopedic clinic to determine whether he needed surgery (Tr. 326).

In January, 2007, Plaintiff was examined at the orthopedic clinic (Tr. 261-62). Plaintiff showed moderate degenerative changes in the right knee--"more than is typically seen for a patient of [his] age." (Tr. 262). Paul Segebarth, M.D., examined Plaintiff, and stated that the MRI report (for which the associated images had been lost) did indicate a meniscus tear in the right knee (Tr. 323). Dr. Segebarth observed that although Plaintiff had tried Vioxx and other anti-inflammatories, he had not tried formal physical therapy or injections, and he did not have "mechanical symptoms"-- i.e., "locking or catching" (Tr. 323-34). According to Dr. Segebarth, Plaintiff "state[d] he continues to try to work out and he can squat 300 pounds." (Tr. 324). X-rays showed "severe medial compartment degeneration" and osteoarthritis. Dr. Segebarth discussed treatment options with Plaintiff, and told him that "given his lack of mechanical symptoms and the fact that he can squat 300 pounds without mechanical pain" that arthroscopic surgery was not a good option (Tr. 324).

Dr. Segebarth recommended conservative treatment and gave Plaintiff bilateral injections (*id.*).

In March, 2007, Plaintiff reported that the injections helped for about three days, but he "did a squat and [was] back to square one." (Tr. 319). Plaintiff was frustrated by the level of service-connected benefits he received from the VA and the fact that he was living in a trailer (*id.*). He reported he had tried retraining to be a licensed practical nurse, but could not pass the test (Tr. 320). In May, 2007, Plaintiff reported his January knee injections were "very effective" in relieving his pain and that his pain medication (Lortab) reduced his pain to a 3.5 to 4 out of 10 (Tr. 314, 317). Dr. Sims requested a brace for Plaintiff's left knee and performed another round of injections (Tr. 317). Plaintiff was fitted with braces for both knees in June, 2007 (Tr. 312), but he complained in December, 2007, that they did not help and again expressed frustration over "not getting anything done" about his knees (Tr. 298, 303).

In January, 2008, the MRI indicated the previously described right meniscus tear "is no longer apparent." (Tr. 253). The scan also showed, however, development of small oblique tears in the posterior horn of both the medial and lateral meniscus (Tr. 254). The following month, Kurt Spindler, M.D., a professor of orthopedics and rehabilitation at Vanderbilt Hospital, interpreted x-rays and MRIs and diagnosed Plaintiff with "[e]nd-stage arthritis in the right knee." (Tr. 336). Dr. Spindler opined that Plaintiff "ha[d] gone too far to even consider an arthroscopy" and recommended a knee replacement (*id.*).

In April, 2008, x-rays were taken of Plaintiff in a standing position which showed "mild medial compartment osteoarthritis [of] both knees, slightly more severe on the right than on the left." (Tr. 337). Jonathan Buzzell, M.D. examined Plaintiff and observed he walked with an antalgic gait, was tender in the front of the knee, and had significant crepitus (Tr. 338). Dr. Buzzell agreed with

Dr. Spindler's assessment that "arthroscopy probably would not be of benefit," and noted that Plaintiff was to be scheduled for surgery (Tr. 339). Dr. Buzzell told Plaintiff that knee replacement might not allow increased activity, but that it might help with weight loss and decreased pain (*id.*). Plaintiff testified the knee replacement was scheduled for June 23, 2008 (Tr. 44), but the record does not show whether it was performed and with what degree of success.

### B. Medical Opinions

David Thompson, M.A., performed a mental status examination in June, 2006 (Tr. 340-44). Plaintiff indicated he was experiencing symptoms of depression related to his inability to work (Tr. 340). Plaintiff stated he was taking hydrocodone and acetaminophen for pain (*id.*). Mr. Thompson observed Plaintiff's gait was slow (Tr. 341). Plaintiff reported "a regular schedule of daily activities," including getting up at an early hour, exercise, bathing, dressing, grooming, visiting a local park with family on the weekends, and shopping with his wife (Tr. 343). Plaintiff told Mr. Thompson he was independent in self-help activities, but needed help getting up in the morning and getting in and out of the shower (*id.*). Mr. Thompson opined that Plaintiff had no mental health concerns that would affect work-related activities (Tr. 344). The following month, Robert L. Paul, Ph.D., reviewed Plaintiff's file and concluded, similarly, that Plaintiff had no medically determinable psychiatric impairment (Tr. 198).

Also in June, 2006, Thomas Mullady, M.D., performed a consultative physical examination of Plaintiff (Tr. 186-89). Plaintiff told Dr. Mullady he could not perform household chores or yard work and could walk only about an eighth of a mile at a time due to knee pain (Tr. 186). Plaintiff was wearing wrist braces and walked with a "marked right leg limp." (Tr. 187-88). Dr. Mullady noted that Plaintiff's MRIs showed minimal disc bulging, multilevel disc degeneration, minimal disc

dessication, and severe osteoarthritis of the left knee (Tr. 187). Dr. Mullady performed a physical examination and noted a decreased range of motion of the cervical and lumbar spines, both knees (with the right knee slightly more limited), right ankle, and wrist joints (Tr. 188). Plaintiff had a strong grip and normal manual dexterity (*id.*). Dr. Mullady opined Plaintiff retained the capacity to occasionally lift 10 pounds but could not lift any amount of weight frequently. He further opined Plaintiff could stand or walk with normal breaks for a total of at least two hours in an eight-hour workday and could sit with normal breaks for about six hours in a workday (Tr. 189).

In July, 2006, William Downey, M.D., reviewed Plaintiff's file and offered a slightly less restrictive assessment. According to Dr. Downey, Plaintiff could lift ten pounds frequently and 20 pounds occasionally (Tr. 191). He could stand or walk about six hours in a workday and sit for about six hours in a workday (*id.*). Dr. Downey opined Plaintiff could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, and could never climb ladders, ropes, or scaffolds (Tr. 192). Dr. Downey stated that Plaintiff's allegations of pain in his knees, elbows, and back were only partially credible because they were disproportionate to what would be expected from the objective findings (Tr. 191, 195-96).

In January, 2008, Dr. James, Plaintiff's treating physician, offered a single-page medical source statement in which she summarized Plaintiff's impairments as degenerative disc disease of the lumbar and cervical spine, degenerative joint disease of both knees, bilateral carpal tunnel syndrome, and obesity (Tr. 252). Dr. James opined that Plaintiff's pain was "intractable and virtually incapacitating" (*id.*). She further opined that work tasks, such as standing for two hours per day, bending, reaching, and manipulating objects, would cause Plaintiff's pain to increase "to such an extent that bed rest and/or medication is necessary." (*Id.*). According to Dr. James, Plaintiff

would experience occasional exacerbations of pain and would consequently be absent from work at least twice monthly (*id.*).

C.    **Hearing Testimony**

At the hearing, the ALJ questioned Plaintiff about the note from Dr. Segebarth indicating that Plaintiff could squat 300 pounds as recently as January, 2007 (Tr. 35-37). Plaintiff testified that he did not tell Dr. Segebarth he could squat 300 pounds, but simply squatted his own body weight in front of the doctor to show how badly his knee crackled. Plaintiff stated he wanted to show the doctor that his muscles were still strong, but his joints were "gone" (Tr. 36). Plaintiff testified that after he demonstrated the squat, Dr. Segebarth told him not to squat or walk, but to instead do "aquatic therapy" for exercise (Tr. 37).

Plaintiff testified that he loses grip in his hands because they go numb, and his hands hurt especially badly when he does pushups, even while wearing his wrist braces (Tr. 38). He testified that his doctors wanted to perform carpal tunnel surgery, but he wanted to get his knees fixed first because he depends on his hands to get out of the bathtub (Tr. 39). Plaintiff testified his neck hurts when he sits for a while and his back hurts when he bends (Tr. 39-40). Plaintiff believed his knees were his most significant problem (Tr. 40). He testified that injections had not worked and pain medications help enough to allow him to do pushups or walk on a treadmill, but also made him sleepy and did not provide significant relief (Tr. 41-42). Plaintiff's attorney observed that his fingernails were so bitten back that they were bloody and he had become tearful several times during the hearing (Tr. 43). Plaintiff was using a knee brace at the hearing (Tr. 41).

D.    **ALJ's Findings**

At step one, the ALJ found that Plaintiff had not engaged in gainful activity since the date

of his application (Tr. 22).  At step two, the ALJ found that Plaintiff had the following combined impairments: status post remote history of left ACL reconstruction; status post right total knee replacement due to severe degenerative joint disease; right Achilles tendinopathy; minimal cervical, thoracic, and lumbar degenerative disc disease; bilateral carpal tunnel syndrome; minimal degenerative joint disease of the left ankle; sleep apnea; and obesity (*id.*).  The ALJ concluded at step three that none of Plaintiff's impairments was severe enough to meet any listing (Tr. 24).  The ALJ then evaluated Plaintiff's residual functional capacity ("RFC") and found he was able to perform light work, with several additional postural limitations: he could only occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl, and he could not climb ladders, ropes, or scaffolds (*id.*).  The ALJ found at step four that Plaintiff could not perform any of his past work, which was medium or heavy exertion (Tr. 26).  Finally, at step five, the ALJ concluded that Plaintiff's postural limitations left the occupational base for light work "virtually intact," and he applied the Medical-Vocational Rules ("Grids") to find that Plaintiff was not disabled (Tr. 27).

## IV.  ANALYSIS

Plaintiff challenges the ALJ's decision on four grounds.  First, he argues the decision is not supported by substantial evidence because the ALJ misstated the record.  Next, he argues the ALJ erred in finding his testimony not credible.  Third, Plaintiff argues the ALJ failed to give appropriate deference to a treating physician's opinion.  Specifically, he argues Dr. James' opinion was entitled to controlling weight because it was supported by objective evidence and not inconsistent with other record evidence, and even if it was not entitled to controlling weight, the ALJ failed to give good reasons for rejecting it.  Fourth, and finally, Plaintiff contends the ALJ failed to consider the impact of his obesity when determining his RFC.

## A.      Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.

1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     ALJ's Misstatements of the Record Evidence**

Plaintiff challenges the ALJ's characterization of the record in three respects, each considered in turn.

**1.     ALJ's Description of Plaintiff's Knee Impairments**

First, the ALJ stated that Plaintiff had already received a right knee replacement in February, 2008, after which "the record does not indicate that he required any further treatment for right knee pain," and he was scheduled for a left knee replacement in June, 2008 (Tr. 22-23). The ALJ repeated this description in another portion of his opinion, where he acknowledged that Plaintiff's right knee osteoarthritis had worsened up until February, 2008, but indicated the problem was resolved by surgery (Tr. 25). The ALJ also noted "arthritic changes" in Plaintiff's left knee that had been treated conservatively with injections and medication, and stated that a surgical replacement was planned for Plaintiff's left knee (*id.*). As Plaintiff points out, this description was error. The ALJ's characterization of Plaintiff's left knee impairment is supported by the record,[1] but the ALJ believed Plaintiff's right knee had been surgically repaired in February, 2008 when, in fact, it had not.

The Commissioner concedes the error, but argues it was harmless. First, the Commissioner

_____

[1] Plaintiff had received injections in his left knee (Tr. 324), and he testified his doctors were "probably" going to replace his left knee (Tr. 41).

argues the ALJ simply confused right with left. The Commissioner points to a mistake in Plaintiff's brief in which he wrote "left" when he meant to write "right," and states: "This is all very confusing. But, if nothing else, it should demonstrate that both sides can err and that such errors are harmless." The Commissioner's answer is wholly unsatisfying. That both sides can err does not imply that an error by the Commissioner is harmless. Furthermore, the comparison makes a false equivalency. The Commissioner characterizes the ALJ's mistake as simply confusing right with left, but the ALJ's error was not so innocuous. Listing Plaintiff's severe impairments, the only mention of Plaintiff's left knee was "status post left [ACL] reconstruction" and the only mention of his right knee was "status post total knee replacement" (Tr. 22). The record shows, however, that both of Plaintiff's knees were arthritic with torn menisceuses (*e.g.*, Tr. 220, 333), and Plaintiff testified his knees were his biggest problem (Tr. 40-41). At best, the ALJ believed Plaintiff had one good knee and one bad knee, where the record shows both his knees were impaired.

Second, the Commissioner suggests the error was harmless because Plaintiff was scheduled to undergo right knee surgery, and if the surgery had been carried out as planned, it would have already occurred by the time the ALJ wrote his opinion. Without taking more evidence, however, the ALJ could not have known whether the surgery was actually performed. More importantly, it would have been improper for the ALJ to assume Plaintiff required no further treatment after the surgery when Plaintiff's prognosis was far less optimistic: Dr. Buzzell told Plaintiff that knee replacement might not allow increased activity, and opined only that it might "help" with weight loss and decreased pain (Tr. 339).

But while the ALJ's description of Plaintiff's knee impairments was error, it does not by itself rise to the level of reversible error. In order to determine Plaintiff's RFC, the ALJ properly

considered medical opinions in the record, all of which were based on examinations showing that Plaintiff suffered from osteoarthritis or degenerative joint disease in *both* knees (Tr. 25, 188, 252). The ALJ's mistake in describing Plaintiff's right knee impairment could not have been prejudicial to Plaintiff unless it affected his assessment of those opinions. I therefore consider the mistake in more detail below in conjunction with the ALJ's other findings.

### 2. ALJ's Discussion of Carpal Tunnel Syndrome

Second, Plaintiff challenges the ALJ's characterization of the evidence of carpal tunnel syndrome. The ALJ stated, "[b]ilateral EMG and nerve conduction studies in May 2006 revealed subjective evidence of carpal tunnel syndrome." (Tr. 23). Plaintiff argues that "EMG and nerve conduction evidence . . . are objective, not subjective evidence . . . ." [Doc. 9 at 10]. Even if the ALJ erred, however, I **FIND** such error was harmless. Whether the evidence was objective or subjective, the ALJ found that one of Plaintiff's severe impairments was bilateral carpal tunnel syndrome and he considered its impact on Plaintiff's ability to work, which was all Plaintiff could have asked for. *See Rabbers*, 582 F.3d at 658 (failure to rate the B criteria was harmless where ALJ nonetheless concluded the claimant had a severe mental impairment, "which was all [the claimant] could have asked for").

### 3. Dr. Segebarth's Note that Plaintiff "can squat 300 pounds"

Third, Plaintiff attacks the ALJ's use of Dr. Segebarth's note: "the patient states that he continues to try to work out and he can squat 300 pounds." (Tr. 324). The ALJ cited this note in finding Plaintiff's subjective description of his impairments was not credible (Tr. 26), and it is therefore discussed in connection with that credibility finding below.

### C.    ALJ's Assessment of Plaintiff's Credibility

#### 1.    Dr. Segebarth's note

Plaintiff argues Dr. Segebarth's note (Tr. 324) must be interpreted in light of his testimony that the "300 pounds" was Plaintiff's body weight, and he merely demonstrated to Dr. Segebarth that he could squat his own weight.   Because the ALJ cited this note as evidence that Plaintiff's testimony was not credible, the issue is whether Plaintiff's explanation is consistent with Dr. Segebarth's note.  *See Meece v. Barnhart*, 192 F. App'x 456, 466, 467 (6th Cir. 2006) (claimant's credibility is not undermined by his daily activities where those activities are "not inconsistent with" his testimony).

Significantly, Dr. Segebarth's note is somewhat ambiguous.  It may be interpreted to mean Plaintiff "states that he continues to try to work out and [states] he can squat 300 pounds," or it may be read, as it is written, to mean that Plaintiff stated he continues to try to work out and he can also squat 300 pounds.  Plaintiff's explanation is consistent with the latter interpretation, though not the former.   Plaintiff has at no time denied that he has continued to try to work out, for example, by doing pushups and walking, and an observation that "he can squat 300 pounds" might well be made after watching a patient demonstrate that he can squat his own weight.  The ambiguity in the note is significant because, assuming that Dr. Segebarth was not mistaken, Plaintiff's explanation is inconsistent with the note only if his explanation was false.   Thus, the ALJ's use of the note to undermine Plaintiff's credibility begs the question of whether Plaintiff is credible.  In other words, the ALJ assumed that Plaintiff was not credible (i.e., that his explanation was false) in order to reach the conclusion that his testimony was inconsistent with the doctor's note, and he used that

inconsistency to complete the circle and conclude Plaintiff was not credible. This was error.

The error will be harmless, nevertheless, if the ALJ's credibility assessment was supported by other substantial evidence. In support of the adverse credibility determination, the ALJ also cited Plaintiff's reported daily activities and Plaintiff's testimony that he has not worked since he applied for benefits (Tr. 26).

## 2. Plaintiff's Financial Straits

Taking this latter reason next, the ALJ found Plaintiff's testimony that he has not worked since 2005 was belied by his other testimony that his sole monthly income was $230 in VA benefits, which he used to support his wife and son. Plaintiff argues that the ALJ's adverse credibility finding, inasmuch as it was based on "the fact that [Plaintiff] and his family live in poverty," was merely speculative. An adverse credibility finding must be based not on the ALJ's intuition, but on objective evidence in the record. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247-48 (6th Cir. 2007). Where the ALJ's credibility assessment is supported by a reasonable assessment of the record, however, it is entitled to great weight, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Rogers*, 486 F.3d at 247.

Plaintiff is correct that his "poverty," standing alone, cannot support the ALJ's finding. Plaintiff testified he lives in a trailer on his brother's property, supporting an inference that he pays no rent, and supplies the trailer with water from a garden hose, supporting an inference that he does not pay for water (Tr. 32). And, while the ALJ stated that Plaintiff's "sole monthly income" is $230, Plaintiff also testified he receives food stamps (Tr. 32). Furthermore, as Plaintiff points out, no one asked him whether he received any other assistance from his family. But the record also contains

evidence that Plaintiff continued to work after he filed his disability claim in June, 2005. For instance, in August, 2006, Plaintiff complained that his knee pain was "making it difficult for him to work" (Tr. 221). Similarly, in January, 2007, Plaintiff discussed "social issues with his job" with his doctor (Tr. 324). The ALJ did not specifically cite either of these notes as evidence that Plaintiff worked after June, 2005, but I **FIND** the ALJ's disbelief of Plaintiff's testimony was based on a reasonable assessment of the record.

It is troubling that the ALJ did not cite these other pieces of evidence in rejecting Plaintiff's testimony because it is impossible to tell whether he in fact considered them. There is necessarily some tension between the principle that a reviewing court may not affirm the Commissioner's decision on grounds not articulated by the ALJ, *see SEC v. Chenery*, 318 U.S. 80, 92 (1943), and the pragmatic recognition that an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence," *see Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 453 (6th Cir. 1999)). Here, however, that tension is resolved by the Commissioner's regulations: the ALJ was required only to give "specific reasons for the finding on credibility," which were "supported by the evidence in the case record." Social Security Ruling ("SSR") 96-7p. The ALJ was not required, in other words, to list all the evidentiary details that could have supported his reasons. I **FIND** the ALJ's reason for rejecting Plaintiff's testimony (his disbelief that Plaintiff had not been working) was supported by evidence in the record.

### 3. Plaintiff's Daily Activities

A claimant's daily activities may undermine the credibility of his testimony if those activities are inconsistent with the testimony. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir.

2007); *Meece*, 192 F. App'x at 466. Citing Plaintiff's reports that he performed light household repairs, shopped, drove, performed self-care activities, and exercised, including pushups and walking two days per week, the ALJ found that Plaintiff's activities were "not suggestive of a totally disabled individual." (Tr. 26). These activities, as discussed more fully below, were somewhat limited, but there were some mild inconsistencies in Plaintiff's reported activities. For example, Plaintiff stated in the application process in March, 2006, that he shopped only three to four times per year and that his wife handled their shopping needs "as much as possible" (Tr. 114), but in June, 2006, he told Dr. Thompson that his daily activities included shopping with his wife (Tr. 343). Standing alone, Plaintiff's daily activities might not provide substantial support for the ALJ's credibility finding, but considered along with the ALJ's reasonable disbelief of Plaintiff's work status, and given the great deference to which an ALJ's credibility assessment is due, I **FIND** Plaintiff's daily activities constitute substantial evidence that Plaintiff's testimony was not entirely credible. I also **FIND** the ALJ's assessment of Plaintiff's credibility was unaffected by his mistake regarding Plaintiff's right knee surgery because all the evidence supporting his credibility finding pre-dates the supposed surgery.

### D.     Treating Physician Rule

Plaintiff also argues that the ALJ erred by failing to give appropriate deference to Dr. James' opinion. Dr. James provided a one-page multiple choice form on which she summarized Plaintiff's impairments and circled a choice opining that his pain was "intractable and virtually incapacitating" (Tr. 252). Dr. James opined that basic work tasks would cause increased pain requiring "bed rest and/or medication" (Tr. 252). She concluded that Plaintiff's pain would cause him to miss work at least twice monthly (*id.*). In determining Plaintiff's RFC, the ALJ gave "little weight" to Dr. James'

opinion, choosing instead to adopt, verbatim, the opinion of a non-examining consultant, Dr. Downey (Tr. 25).

The law governing the weight to be given to a treating physician's opinion is well settled. A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). To reject such an opinion, the ALJ must find either that it is not well supported by medical evidence or that it is inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Rogers*, 486 F.3d at 242. When the ALJ does reject a treating source's opinion, he "must provide 'good reasons' . . . , 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting SSR 96-7p). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference commensurate with the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009).

### 1.    Weight of Dr. James' Opinion

As an initial matter, Dr. James' opinion was inconsistent with other substantial evidence in the record, and it is therefore not entitled to controlling weight. Dr. Mullady, the consultative examiner, opined Plaintiff could walk or stand for at least two hours and sit for about six hours

during a normal workday (Tr. 189), and Dr. Downey opined he could walk, stand, or sit for six hours (Tr. 191), but Dr. James opined that Plaintiff would be unable to perform such activities without bed rest and/or medication (Tr. 252). Still, although Dr. James' opinion was not fully consistent with the other opinions in the record, it was not "wholly inconsistent" with the record. I **FIND** that although Dr. James' opinion was not entitled to controlling weight, it was not nearly as inconsistent with the record as the ALJ believed. *See* 20 C.F.R. § 404.1527(d)(4).

First, Dr. James' opinion is the most restrictive in the record, but it is also considerably more recent than the 2006 opinions of Drs. Mullady and Downey, and other evidence shows Plaintiff's condition may have deteriorated in the interim. In December, 2006, for example, Plaintiff was diagnosed with a torn meniscus and was prescribed a knee brace (Tr. 326-34). And only one month after Dr. James offered her opinion, Dr. Spindler diagnosed Plaintiff with "end-stage" arthritis in his right knee and recommended knee replacement (Tr. 336). Second, other VA physicians noted profound functional effects owing to Plaintiff's knee problems. Dr. Moore's diagnosis in April, 2006, stated that Plaintiff's left knee problems prevented him from chores, exercise, and sports, and Dr. Sims' December, 2006, diagnosis stated that his right knee problems, which were secondary to the left knee problems, prevented him from chores, shopping, exercise, and sports, and moderately affected his ability to recreate and travel (Tr. 220, 333). And third, Dr. James' opinion is simply not as restrictive as the ALJ suggested. The ALJ characterized Dr. James' opinion as stating that Plaintiff's pain "would require daily bed rest during a work day," but Dr. James said only that work activities would cause Plaintiff such pain that he would require bed rest *and/or medication* (Tr. 252) (emphasis added). It is beyond dispute that Plaintiff has long been medicated for the pain associated with his various impairments, including "excessive" amounts of Tylenol, hydrocodone/Lortab, and

a trial of Oxycodone (Tr. 171, 314, 340).

### 2. Good Reasons?

Dr. James' opinion, therefore, was not "wholly inconsistent" with the record, and the ALJ was not entitled to disregard it. Thus, the ALJ could properly reject Dr. James' opinion in favor of the least restrictive opinion in the record--the opinion of a non-examining consultant--if he gave "good reasons" for doing so. The ALJ offered two reasons for rejecting Dr. White's opinion: its inconsistency with [Plaintiff's] reported daily activities . . . [and] objective spinal scans and x-rays." (Tr. 25)

First, the ALJ was correct that the objective evidence of Plaintiff's back impairments showed only "mild" or "minimal" disc disease (Tr. 180, 187), and insofar as Dr. James' opinion was based on Plaintiff's back impairments, the ALJ had good reason to reject it. *See Brock v. Comm'r of Soc. Sec.*, No. 09-5673, 2010 WL 784907, at *3 (6th Cir. 2010) (unpublished) (ALJ's finding that treating physician opinion is not supported by clinical data meets the "good reasons" requirement).

But Dr. James did not base her opinion solely on Plaintiff's back impairments. It appears she believed Plaintiff's impairments combined to cause his incapacitating pain. In addition to degenerative disc disease, Dr. James' medical source statement lists degenerative joint disease of both knees and obesity (Tr. 252).[2] The ALJ did not offer any reason to reject these impairments as bases for Plaintiff's incapacitating pain except to say that Dr. James' opinion is "wholly inconsistent with [Plaintiff's] reported daily activities" (Tr. 25). Those activities, as summarized by the ALJ, are as follows: performing light household repairs, shopping, driving, self-care activities, and exercise,

---

[2] Dr. James also mentions Plaintiff's diagnosis of bilateral carpal tunnel syndrome (Tr. 252), but as the ALJ noted, that condition was treated conservatively (Tr. 25), and Dr. Mullady stated Plaintiff had a strong grip and normal manual dexterity (Tr. 188).

including Dr. Segebarth's report that Plaintiff "was able to squat 300 pounds" (Tr. 26). Plaintiff

takes issue with the ALJ's characterization of these activities, arguing they lack context. The issue,

therefore, is whether Plaintiff's reported activities, with the proper context, are inconsistent with Dr.

James' report or whether they are too "intermittent" to show that Plaintiff can engage in substantial

activity without severe pain. *See Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967).

Taking Plaintiff's daily activities in turn, Plaintiff reported during the application process

that he was able to perform "very light home repairs" such as replacing doorknobs, but only for

about 30 minutes at a time, and only once or twice per year (Tr. 113). Other than these isolated

tasks, however, Plaintiff has consistently reported he cannot regularly perform household chores or

yardwork (Tr. 113-14, 186). The ability to undertake brief, infrequent, and non-strenuous home

repairs is simply not inconsistent with Dr. James' opinion that regular work would cause Plaintiff

to suffer severe pain. Plaintiff's driving and "self care" activities follow the same analysis.

Although Plaintiff did report he could drive (Tr. 114), he also reported he could no longer work as

a truck driver because of "gear changing, clutch pushing, and climbing in and out of the truck." (Tr.

126). With respect to "self care" activities, Plaintiff told Dr. Thompson that his daily activities

included bathing, dressing, and grooming, but Plaintiff also consistently reported he needed his

wife's help with getting in and out of the shower, getting up from the toilet, getting out of bed, and

dressing (Tr. 112, 343). None of these reported daily activities contradict Dr. James' opinion that

Plaintiff is unable to perform regular work without severe pain.

Only shopping and exercise remain. Plaintiff reported he shopped three to four times per

year and that his wife handled their shopping needs "as much as possible" (Tr. 114), but three

months later reported shopping with his wife (Tr. 343). Plaintiff did not say how often he shopped

with his wife, however, and this isolated mention of "shopping," by itself, is too equivocal to justify rejecting Dr. James' opinion. The inconsistency between Plaintiff's reports, as noted above, provides some support for the ALJ's credibility assessment, but neither of Plaintiff's versions of his shopping habits show activity of a quality that would contradict Dr. James' opinion.

The ALJ's rejection of Dr. James' opinion, therefore, hinges on whether Plaintiff's "exercise" is inconsistent, as the ALJ believed, with that opinion. Plaintiff testified he was able to do pushups and walk for exercise twice per week, but only after taking pain medicine (Tr. 42). According to Plaintiff, however, trying to exercise is not without consequence: his medication makes him sleepy, and his knees hurt when he wakes up (*id.*). Again, these reports are entirely consistent with Dr. James' opinion that regular work activities, including standing for two hours during a workday, would cause Plaintiff such pain that he would require medication or bed rest.

Finally, then, the ALJ's rejection of Dr. James' opinion rests on the ambiguous notation by a single doctor that Plaintiff "can squat 300 pounds" (Tr. 324). This could only have been a "good reason" for rejecting Dr. James' opinion if, as the ALJ apparently concluded, Plaintiff's explanation was false. I do not make a finding whether it was false or not. But given the insubstantiality of the other evidence supplied by the ALJ, it is difficult to escape the conclusion that the ALJ's interpretation of this cryptic notation was colored by his own mistaken assessment of Plaintiff's knee impairments. As explained above, the ALJ incorrectly believed Plaintiff's knee impairments were less significant than they actually were. The ALJ may not have rejected Plaintiff's explanation of Dr. Segebarth's note had he not underestimated the severity of Plaintiff's knee impairments. Consequently, I **CONCLUDE** that the ALJ's mistake was not harmless because his balancing of the various medical opinions was tipped by an incomplete grasp of the objective evidence.

### E.    Plaintiff's Obesity

For similar reasons, the ALJ's opinion must be remanded for further consideration of Plaintiff's obesity. According to the Commissioner's regulations, the ALJ must consider the effects of a claimant's obesity in combination with other impairments. SSR 02-1p; *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006). Not only that, but the ALJ must "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p at ¶ 8. Obesity can affect a claimant's RFC in a variety of ways: it may cause sleep apnea, which in turn causes drowsiness; it may affect social functioning; and it may impair the claimant's ability to perform routine movements or sustain a given level of activity over time. *Id.* Significant here, obesity may exacerbate arthritic pain in weight-bearing joints. *Id.* Here, the ALJ acknowledged the potential effects of obesity, and stated he had considered them in evaluating Plaintiff's RFC (Tr. 25). Other than remarking that Plaintiff's sleep apnea "is treated satisfactorily with a CPAP machine" (Tr. 25), the ALJ did not explain his assessment of the effects of Plaintiff's obesity. In particular, he did not explain the effects of Plaintiff's obesity in combination with his knee impairments.

An ALJ's failure to explain his obesity analysis will not always be prejudicial. *See Bledsoe*, 165 F. App'x at 412 (holding that an ALJ did not err by failing to mention obesity where obesity factored into the decision indirectly via an expert's report that did consider obesity). Here, however, where three doctors reached different conclusions regarding Plaintiff's functional impairments due to his obesity and other impairments, the ALJ could not properly adopt one over the others without saying why. Without an explanation of his reasoning, it is impossible to know whether the ALJ would have reached the same conclusion if he had fully understood the severity of Plaintiff's knee impairments. I therefore **CONCLUDE** the ALJ's failure to specifically explain his findings with

respect to Plaintiff's obesity was reversible error. *Cf. Rabbers*, 582 F.3d at 657-58 (remand is required where it is difficult or impossible to determine whether an error is harmless because the record contains "conflicting or inconclusive evidence" not resolved by the ALJ).

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' pleadings, I RECOMMEND:[3]

(1)     Plaintiff's motion for judgment on the pleadings [Doc. 8] be **GRANTED**.

(2)     Defendant's motion for summary judgment [Doc. 13] be **DENIED**.

(3)     The Commissioner's decision denying benefits be **REVERSED** and this action be **REMANDED** to the Commissioner for further proceedings.


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).